**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

RYAN OBERTHIEN,

        Plaintiff,

vs.

CRST LOGISTICS, INC.,
CRST INTERNATIONAL, INC., and
AMANDA PIERCE,

        Defendants.

No. 15-CV-128-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*    *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*III.*   *SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . **2**

*IV.*   *SUMMARY JUDGMENT STANDARD* . . . . . . . . . . . . . . . . . . . . . . . **2**

*V.*    *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . **3**

      *A.*     *Employment and FMLA Leave* . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      *B.*     *Conflict with Management* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
      *C.*     *Conclusion of Employment* . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

*VI.*   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

      *A.*     *Disability Discrimination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
            *1.*    *Adverse employment action* . . . . . . . . . . . . . . . . . . . . . . **10**
            *2.*    *Pretext* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
                *a.*    *Productivity goals* . . . . . . . . . . . . . . . . . . . . . . . **14**
                *b.*    *Justification for misconduct* . . . . . . . . . . . . . . . . **14**
                *c.*    *Treatment of other employees* . . . . . . . . . . . . . . . **16**
      *B.*     *FMLA Discrimination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
      *C.*     *Hostile Work Environment* . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*VII.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

# I. INTRODUCTION

The matters before the court are Defendants CRST Logistics, Inc., CRST International, Inc. and Amanda Pierce's (collectively, "CRST") "Motion for Summary Judgment" ("Motion") (docket no. 13) and "Motion to Strike Supplement to Plaintiff's Summary Judgment Resistance" ("Motion to Strike") (docket no. 19).

# II. PROCEDURAL HISTORY

On October 13, 2015, Plaintiff Ryan Oberthien filed a Petition (docket no. 3) in the Iowa District Court for Linn County alleging the following claims against CRST: (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"); (2) harassment causing a hostile work environment in violation of the ADA; and (3) retaliation in violation of the Family and Medical Leave Act ("FMLA"). On November 16, 2015, CRST removed the case, bringing it before the court. *See* Notice of Removal (docket no. 2). On November 23, 2015, CRST filed an Answer (docket no. 5). On January 13, 2017, CRST filed the Motion. On February 3, 2017, Oberthien filed a Resistance (docket no. 14). On February 13, 2017, CRST filed a Reply (docket no. 17). On March 15, 2017, Oberthien filed a Supplement to the Resistance (docket no. 18). On March 20, 2017, CRST filed the Motion to Strike. Neither party requests oral argument and the court finds that oral argument is unnecessary. The matters are fully submitted and ready for decision.

# III. SUBJECT MATTER JURISDICTION

The court has original jurisdiction over the claims in the Petition because they arise under the United States Code. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

# IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324).

The court must view the record in the light most favorable to the non-moving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case necessarily renders all other facts immaterial.'" *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (alteration omitted) (quoting *Celotex*, 477 U.S. at 322-23).

## V. RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Oberthien and affording him all reasonable inferences, the uncontested material facts are as follows.

### A.  Employment and FMLA Leave

In June or July of 2013, Oberthien became employed with CRST as a capacity executive.  "CRST Statement of Undisputed Facts in Support of Motion" ("CRST Facts") (docket no. 13-2) ¶ 3; "CRST Appendix in Support of Motion" ("CRST App'x") (docket no. 13-3) at 8.[1]  When Oberthien began working at CRST, he initially reported to capacity region manager Tom Lower.  CRST App'x at 8.

Upon commencing his employment with CRST, Oberthien received a copy of CRST's employee handbook.  CRST Facts ¶ 4; CRST App'x at 14; *see also* CRST App'x at 28-49.  The employee handbook identifies "[e]xcessive absenteeism or any absence without notice" as a violation subject to disciplinary action and provides that "[d]isciplinary actions are generally progressive."  *Id.* at 29-30.  The employee handbook also describes CRST's leave of absence policy, which provides for twelve weeks (equivalent to 480 hours) of leave time to FMLA-eligible employees.  *Id.* at 41.  The handbook encourages employees to contact a human resources representative if they receive unfair treatment due to their use of FMLA leave, or if they are harassed or discriminated against due to a disability.  *Id.* at 42, 45.

In February of 2014, Oberthien's daughter was diagnosed with cancer.  CRST Facts ¶ 5; CRST App'x at 8.  Due to his daughter's condition, CRST approved Oberthien for 480 hours of FMLA leave.  CRST Facts ¶ 10; CRST App'x at 9, 186-192.  Oberthien's FMLA leave was structured to allow him to use his leave time whenever the need arose, rather than for an unbroken twelve-week period.  *See, e.g.*, CRST App'x at 8 (Oberthien describing his leave arrangement as allowing him "to come . . . when I was available and could come to work"); *id.* at 15 (Oberthien stating that "it was a one-day-at-a-time

---

[1] Oberthien had previously been employed with CRST from June of 2012 through March of 2013.  *See* CRST Facts ¶ 1-2.  This prior employment period is not at issue in this case.

situation" depending on the status of his daughter's treatment at any given time); *id.* at 122 (identifying the FMLA leave type as "unscheduled"). Oberthien's 480-hour allotment applied to the twelve-month period from February of 2014 through February of 2015, at which point Oberthien could be eligible for an additional 480 hours. *See, e.g.*, CRST Facts ¶ 10; CRST App'x at 87 (stating that Oberthien's FMLA eligibility would reset in February of 2015); *id.* at 192 (referring to "a 'rolling' 12-month period"). Oberthien was expected to provide his manager with timely notice whenever he planned to use FMLA leave. CRST Facts ¶¶ 16, 19, 37; CRST App'x at 15, 112.

By October 31, 2014, Oberthien had taken 492 hours of FMLA leave, exceeding his initial allotment by twelve hours. CRST Facts ¶ 26; CRST App'x at 69. Due to Oberthien's early exhaustion of his 480-hour period, CRST approved him for 80 additional hours. CRST Facts ¶ 26; CRST App'x at 69. By December 17, 2014, Oberthien had approximately 30 hours remaining of the supplemental 80-hour period. CRST App'x at 70. On that date, CRST informed Oberthien that "an administrative separation of employment may be necessary" if he exhausted the 80-hour period before his FMLA eligibility reset. CRST Facts ¶¶ 18, 32; CRST App'x at 70. CRST further informed Oberthien that, if an administrative separation became necessary, it would implement a "catastrophic policy" to provide Oberthien with a post-separation stipend to assist with his daughter's health care costs. CRST Facts ¶ 32; CRST App'x at 70. By December 31, 2014, Oberthien had only 15 hours remaining of the supplemental 80-hour period. CRST Facts ¶ 35; CRST App'x at 87. CRST reminded Oberthien that an administrative separation, with catastrophic policy, may be necessary if he exhausted his hours. CRST Facts ¶ 35; CRST App'x at 87. Oberthien did not exhaust his remaining hours—his FMLA eligibility reset in February of 2015 and no administrative separation occurred. "Oberthien Appendix of Documents Supporting Resistance" ("Oberthien App'x") (docket no. 14-3) at 14.

### B. Conflict with Management

In September of 2014, Oberthien was reassigned to capacity region manager Amanda Pierce. CRST Facts ¶ 13; CRST App'x at 10, 112. Oberthien and Pierce developed a system whereby, on any given day, Oberthien was expected to notify Pierce by 7:00 a.m. via text message if he expected to be tardy or absent from work. CRST Facts ¶¶ 19, 37; CRST App'x at 24, 67, 112-13. On several occasions, Oberthien failed to timely notify Pierce about his tardiness and/or absences—some of which were not related to his daughter's medical treatment. CRST Facts ¶¶ 28, 33, 34, 36, 38, 40; *see also* CRST App'x at 72-73, 85. Oberthien apparently had similar issues when he worked under Lower, but he was never confronted about them. *Cf.* Oberthien App'x at 12. However, Pierce regularly confronted Oberthien about his notification issues, reminded him of her expectations and, on one occasion, initiated disciplinary action against him. CRST Facts ¶¶ 27, 30, 34, 36; CRST App'x at 58.

Beyond the notification issues, there were additional instances of conflict between Pierce and Oberthien occurring "[o]n a daily basis." CRST App'x at 10. For example: at times when Oberthien left work early, Pierce would inquire as to why he was leaving and would remind him that there were "loads still on the board"; when Oberthien failed to promptly answer a ringing phone, Pierce commented, "Do you not know how to answer a phone? Then you probably shouldn't be working here."; during a team meeting, Pierce confronted Oberthien about failing to meet his productivity goals and commented that "if you were here all day every day you would have hit your goals"; and, lastly, Pierce reassigned one of the carrier loads that Oberthien serviced to another employee because she did not like the terms that Oberthien had negotiated. CRST Facts ¶ 14; CRST App'x at 10-11. Oberthien informally complained about Pierce to team captain Stephen Funderburk, director of carrier sourcing (and Pierce's immediate supervisor) Jeremy Snyder and human resources representative Brooke Willey. *See* CRST App'x at 12

(Oberthien describing that he "pulled [Funderburk] into the office" to complain about Pierce and that he and Willey "would just talk back and forth"); Oberthien App'x at 36-37 (Snyder describing "off-the-record . . . man-to-man kind of conversations" with Oberthien wherein Oberthien complained about Pierce). Due to Pierce's treatment of Oberthien, Oberthien asked Funderburk, Snyder and another manager, Brandon Bradley, if he could be reassigned to work under a different manager. CRST Facts ¶ 39; "Oberthien's Statement of Additional Facts" ("Oberthien Facts") (docket no. 14-2) ¶ 16; CRST App'x at 14; Oberthien App'x at 37. Oberthien was unable to secure a reassignment. CRST Facts ¶ 39; CRST App'x at 14.

### C. Conclusion of Employment

On February 6, 2015, Oberthien was tardy for non-FMLA purposes when returning to work after his lunch break. CRST Facts ¶ 40; CRST App'x at 21. Oberthien did not notify Pierce of his tardiness, but instead notified Funderburk and Snyder. CRST Facts ¶ 40; CRST App'x at 21, 59. Oberthien elected to notify Funderburk and Snyder instead of Pierce because he was worried that Pierce would discipline him. *See* CRST App'x at 21; Oberthien App'x at 14. On February 9, 2015, Oberthien sent a message to Bradley over CRST's internal messaging system complaining that Pierce hated him, would not give him anything he wanted and treated him "like shit 100 % of the time." CRST Facts ¶ 41; CRST App'x at 21, 59.

On February 11, 2015, Oberthien was issued a "Final Written" disciplinary action as a result of his misconduct on February 6 and 9. CRST Facts ¶ 43; CRST App'x at 59-60. Oberthien was notified of the disciplinary action during a meeting with Pierce and human resources representative Karen Carlson. *See* CRST App'x at 132. Oberthien expressed displeasure at being disciplined and refused to sign the disciplinary document. CRST Facts ¶ 43; CRST App'x at 6, 132. Following the meeting, Carlson encouraged Oberthien to take the rest of the day off. CRST Facts ¶ 44; CRST App'x at 7, 132.

Oberthien retrieved photographs of his daughters from his desk and then left work early, as Carlson had suggested. CRST Facts ¶ 45; CRST App'x at 7. Despite retrieving the photographs, Oberthien left certain other personal items at his desk. Oberthien App'x at 15. After Oberthien left, Carlson initiated the process of canceling Oberthien's building access. CRST App'x at 133.

After learning that Oberthien left work early on February 11, Snyder worried that the situation would distract other employees from their work. Oberthien Facts ¶ 22; CRST App'x at 167. Despite not being present in Oberthien's disciplinary meeting, Snyder assumed that Oberthien permanently ended his employment—either because he quit or because he was terminated. *See* CRST App'x at 168. In an effort to mitigate any distraction among other employees, Snyder communicated to the employees near Oberthien's desk that Oberthien was "no longer with the company." Oberthien Facts ¶ 23; CRST App'x at 168. Shortly thereafter, Snyder learned that Oberthien had not, in fact, quit or been terminated. *See* CRST App'x at 167. However, Snyder did not follow up with the employees to correct his incorrect statement about Oberthien leaving the company. Oberthien Facts ¶ 25; CRST App'x at 168.

On February 12, 2015, Oberthien sent Pierce a text message at 6:50 a.m. notifying her that he would be tardy because "[t]he emotional and mental stress you have put on me has made it tough to sleep." CRST Facts ¶ 47; CRST App'x at 135-36. At approximately 7:30 a.m., Oberthien received a text message from a co-worker relaying Snyder's communication that Oberthien was no longer with the company. CRST Facts ¶ 48; CRST App'x at 7. At 7:51 a.m., Pierce sent Oberthien a text message requesting that he contact human resources. CRST Facts ¶ 49; CRST App'x at 107. At least once on the morning of February 12, human resources representative Angela Stastny attempted to call Oberthien but was unable to reach him. CRST App'x at 172-73. According to Stastny, she hoped to further discuss Oberthien's disciplinary action from the prior day and to address any

concerns he had. CRST App'x at 174. Oberthien believed that human resources representatives were trying to contact him to formally terminate him. Oberthien App'x at 17-18. After leaving early on February 11, 2015, Oberthien never returned to work at CRST. *See* CRST Facts ¶ 55; CRST App'x at 6 (identifying February 11, 2015 as Oberthien's last day working at CRST).

On February 18, 2015, CRST informed Oberthien's health insurance provider that Oberthien was no longer employed with CRST. CRST Facts ¶ 59; CRST App'x at 175. Accordingly, Oberthien's health insurance coverage was terminated retroactive to Oberthien's last day of employment on February 11, 2015. CRST Facts ¶ 60; CRST App'x at 175. CRST's employee handbook provides that "[a]n employee who fails to report to work or call in for three consecutive workdays will be terminated for job abandonment." CRST Facts ¶ 56; CRST App'x at 40. On February 24, 2015, Carlson sent a letter to Oberthien communicating that Oberthien was a no-call no-show for more than three consecutive days and that, accordingly, CRST considered him to have voluntarily resigned due to job abandonment. *See* CRST Facts ¶ 57; CRST App'x at 146.

## VI. ANALYSIS

Oberthien alleges that CRST's conduct amounts to disability discrimination, disability harassment creating a hostile work environment and FMLA retaliation. CRST argues that the court should grant summary judgment in its favor on all three claims.

### A. Disability Discrimination

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees." 42 U.S.C. § 12112(a). Where no direct evidence of discrimination exists, claims of disability discrimination under the ADA are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). Under this framework,

[t]he plaintiff first has the burden of establishing a prima facie case: (1) that the plaintiff was disabled within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job; and (3) a causal connection between an adverse employment action and the disability. The burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action. Finally, the burden shifts back to the employee to show that the proffered reason was, in reality, a pretext for discrimination.

*Id.* (internal citations omitted).

CRST does not dispute that Oberthien is "disabled within the meaning of the ADA"[2] or that he was qualified to perform the job. *See* "CRST Brief in Support of Motion for Summary Judgment" ("CRST Brief") (docket no. 13-1) at 4, 4 n.2. However, CRST argues that summary judgment is appropriate on this claim because the record does not establish a genuine dispute of material fact with respect to (1) whether Oberthien suffered an adverse employment action, *id.* at 4-5, or (2) whether CRST's justification for any adverse employment action is pretextual, *id.* at 6-7.

### 1. *Adverse employment action*

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Sellers v. Deere & Co.*, 791 F.3d 938, 942 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Thomas v. Corwin*, 483 F.3d 516, 528 (8th Cir. 2007)). An adverse employment action "requires an official act of the enterprise, a company act." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998). Termination is the quintessential adverse employment action; however, "to be

---

[2] The ADA protects against "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Thus, Oberthien is an ADA-protected individual due to his association with his disabled daughter.

'adverse' the action need not always involve termination or even a decrease in benefits or pay." *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 632 (alteration omitted) (quoting *Sellers*, 791 F.3d at 942). Voluntary employment changes do not amount to adverse employment actions. *See Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003) (observing that "it is true that a plaintiff cannot state an adverse employment action if he voluntarily resigned," provided that the resignation was truly voluntary).

CRST argues that there is no genuine dispute of material fact with respect to any adverse employment action because Oberthien was not, in fact, terminated. CRST Brief at 5. CRST points to evidence that Oberthien was not terminated at the February 11 disciplinary meeting, Oberthien understood that he remained employed after leaving work on February 11, CRST management never advised Oberthien that he was terminated and Oberthien's employment ended only after he no-call no-showed on three consecutive days. *See id.* In CRST's view, Oberthien voluntarily resigned from his employment by abandoning the job. *Cf. id.*; *see also* CRST App'x at 119 (describing Oberthien's termination as "voluntary" in letter to EEOC).

Oberthien acknowledges that CRST management never affirmatively communicated to him that he was terminated, CRST App'x at 6, but Oberthien emphasizes that he likewise never communicated that he had resigned. *See* Resistance at 3. Oberthien further argues that the evidence on record raises a genuine dispute as to whether he was terminated. *See id.* 2-6. The court agrees. While the evidence identified by CRST would suggest that Oberthien was not terminated, other evidence similarly suggests that Oberthien was indeed terminated. For example, in the aftermath of Oberthien's disciplinary meeting on February 11, 2015: (1) CRST initiated the process of terminating his building access, (2) it declined to correct Snyder's incorrect communication that Oberthien was "no longer with the company" and (3) Pierce uncharacteristically failed to acknowledge Oberthien's text message that he would be tardy on February 12, instead directing him to "please

contact human resources." CRST App'x at 107. Viewed in the light most favorable to Oberthien, a reasonable jury could interpret these events as official acts by CRST to prevent Oberthien's return to work. *See Ellerth*, 524 U.S. at 762. Accordingly, the court finds that Oberthien has demonstrated a genuine dispute of material fact with respect to an adverse employment action.

### 2. Pretext

If an employee establishes a prima facie case of discrimination, the burden shifts to the employer to proffer a legitimate nondiscriminatory rationale for the adverse employment action. *Oehmke*, 844 F.3d at 755. If the employer does so, the burden shifts back to the employee to show that the proffered rationale is merely pretext for a discriminatory motive. *Id.* "There are at least two routes for demonstrating a material question of fact as to pretext: first, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact; or, second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer." *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015). "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012) (quoting *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010)). Evidence supporting a prima facie case of discrimination may also support a showing of pretext. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). However, pretext requires a heightened showing "because unlike evidence establishing the prima facie case, evidence of pretext . . . is viewed in light of the employer's justification." *Id.* (quoting *Sprenger v. Fed. Home Loan Bank*, 253 F.3d 1106, 1111 (8th Cir. 2001)); *accord Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 997 (8th Cir. 2014).

Because the court has found a genuine dispute of material fact with respect to

Oberthien's termination after the February 11, 2015 disciplinary meeting, the court must consider whether CRST's proffered justification for Oberthien's discipline and subsequent termination is pretextual. Assuming that Oberthien can establish a prima facie case of discrimination, CRST claims that it terminated[3] Oberthien due to his failure to notify Pierce that he expected to be tardy when returning from his lunch break, and due to the message that Oberthien sent to another manager, stating that Pierce treated him "like shit." *See* CRST Brief at 7. Oberthien does not argue that CRST's proffered reasons lack any basis in fact but, instead, argues that discrimination was the true reason for his termination. *See* Resistance at 6-14 (arguing that CRST's actions were motivated by disability discrimination and linking his termination to Pierce's "disability-based bullying behavior"). Oberthien appears to put forth three theories in support of his pretext argument: (1) he was terminated "for not making his productivity goals because of his absences from work . . . to be with his cancer-stricken daughter"; (2) his misconduct was a justified response to Pierce's purported disability harassment, and his termination was punishment for resisting such harassment; and (3) Pierce has a history of treating employees unfairly, such that he was more likely terminated for unfair reasons than for legitimate ones. *See* Resistance at 7-14; Supplement to the Resistance.[4]

---

[3] As addressed above, CRST disputes that it terminated Oberthien. However, because Oberthien has demonstrated a genuine dispute on the issue, and for the sake of convenience, the court shall assume for purposes of its analysis that CRST terminated Oberthien.

[4] Oberthien points to various evidence in the record without explicitly identifying whether such evidence relates to his prima facie case or to pretext. *See* Resistance at 7-14 (generally describing purported mistreatment by Pierce). Because CRST challenges Oberthien's ability to raise a genuine issue of pretext, *see* CRST Brief at 6 ("Here, Plaintiff cannot show CRST's action was pretextual."), the court interprets Oberthien's briefing to argue pretext based on evidence underlying his prima facie case. *See Smith*, 302 F.3d at 834.

### a. Productivity goals

Oberthien argues that Pierce discriminated against him because he regularly missed work to care for his daughter. Resistance at 8-9. In support of this theory, Oberthien points to the occasion where Pierce attributed his failure to meet productivity goals to his inability to work "all day every day." *Id.* at 8. Such evidence does not establish a genuine dispute as to pretext. Even assuming that such comment would be probative to Oberthien's prima facie case, viewed in light of CRST's proffered reason for terminating Oberthien, the comment does not indicate pretext. *Smith*, 302 F.3d at 834. There is no evidence in the record as to when Pierce made this comment, preventing any insinuation of pretext based on temporal proximity to Oberthien's termination. Further, the record is entirely lacking as to any formal or informal documentation of CRST's concerns with Oberthien's productivity—warranting a conclusion that Pierce's comment was an isolated occurrence that had no practical bearing on Oberthien's ultimate termination. The lack of documentation regarding Oberthien's productivity is pitted against the voluminous documentation supporting CRST's proffered explanation that Oberthien was terminated for his recurring failure to timely notify Pierce when he would be tardy or absent. *See* CRST App'x at 58, 72-73, 75-77, 80-81, 85-86, 88, 90-91, 94-107. In short, Pierce's comments do not establish a genuine dispute regarding pretext.

### b. Justification for misconduct

Oberthien argues that he only engaged in the misconduct precipitating his termination "because . . . Pierce had been abusing . . . Oberthien in the workplace because of his employer-approved use of FMLA time to be with his cancer-stricken daughter." Resistance at 7. Oberthien implies that CRST terminated him, not because of his misconduct itself, but because his misconduct was a "cry for help" motivated by Pierce's harassment. *See id.* at 10; *cf.* Oberthien App'x at 14-15. Oberthien points to evidence that he was regularly mistreated by Pierce, other employees knew of the mistreatment and his

complaints and attempts to be reassigned were unsuccessful. Resistance at 7-10. Against this backdrop, Oberthien argues that his misconduct was a mere expression of frustration and he was unfairly punished for it. *Id.* at 10. The evidence put forth by Oberthien, and his characterization of such evidence, does not demonstrate a genuine issue of material fact as to pretext.

First, the employee handbook instructs employees to raise any harassment concerns with "the appropriate Manager or the Human Resources Department." CRST App'x at 45. However, despite characterizing his actions as a "cry for help" motivated by Pierce's harassment, Oberthien did not send his message about Pierce to a human resources representative or to Snyder, Pierce's supervisor. Instead, Oberthien sent the message to Bradley, who was one of Pierce's manager peers with no apparent supervisory authority over her. *See* CRST App'x at 14 (referring to Bradley as the Northeast region manager); *id.* at 112 (identifying Pierce as the Midwest region manager). By failing to raise his concerns to anyone capable of acting on them, Oberthien's stated intent to communicate a "cry for help" rings hollow. *See also Dose v. Buena Vista Univ.*, 229 F. Supp. 2d 910, 926 (N.D. Iowa 2002) (declining to consider the intent behind an employee's actions because the pretext inquiry solely "concerns itself with whether the employer's stated reasons for termination were in fact the actual reasons for the action taken").

Second, it is undisputed that Oberthien was expected to notify Pierce when he would be absent or tardy. Indeed, the record shows that Oberthien had a history of formal and informal discipline for failing to notify Pierce pursuant to this expectation. *See, e.g.*, CRST App'x at 58, 72-73, 76-77, 80-81, 85-86 (documentation of written warning, text messages and emails addressing Oberthien's non-compliance with the notification expectations). Oberthien does not characterize these previous failures to notify Pierce as expressions of his feelings of frustration. *See* Resistance at 10 (stating that Oberthien "expressed his feelings about . . . Pierce's continuing supervision of him on February 6

and 9, 2015"). Therefore, the discipline he received on prior occasions cannot be considered unfair punishment for expressing such feelings. Oberthien's consistent failure to properly notify Pierce, as well as CRST's general policy of progressive discipline for "any absence without notice," CRST App'x at 29-30, place CRST's decision to terminate Oberthien in full compliance with company policy. In short, Oberthien repeatedly failed to comply with the notification policy instituted by Pierce, and CRST terminated him in accordance with its stated disciplinary policies. Oberthien's protected status under the ADA does not insulate him from termination for repeated failures to adhere to company policies. *Cf. Geithner*, 776 F.3d at 542 (recognizing, in the retaliation context, that longstanding concerns about an employee's adherence to company standards lend support to the legitimacy of an employer's proffered reason for the employee's termination).

In short, Oberthien's justification of his misconduct does not establish a genuine dispute regarding pretext.

### c. *Treatment of other employees*

Oberthien argues that Pierce's purported harassment and unfair treatment of other CRST employees reveals that CRST's reason for terminating Oberthien was pretextual. *See* Resistance at 10-14; Supplement to Resistance.[5] Particularly, Oberthien compares his

---

[5] In the Motion to Strike, CRST argues that the court should strike the Supplement to Resistance because it is barred by the Federal Rules of Civil Procedure and the Local Rules. *See* Brief in Support of Motion to Strike (docket no. 19-1) at 2-4. Particularly, CRST argues that Federal Rule 56 and Local Rule 56 do not contemplate the filing of a supplement to summary judgment materials. *Id.* at 2. CRST further argues that Federal Rule 37 prohibits a party from relying on a witness that was undisclosed under Federal Rule 26. *Id.* at 2-4. Because Oberthien failed to disclose Whitney Gauley in his initial disclosures and supplements to his initial disclosures, *see* CRST Ex. A to Motion to Strike (docket no. 19-2), Oberthien "is not allowed to use that . . . witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Oberthien argues that Gauley's situation amounted to "new evidence" that he "could not have had access [to] at the time of the filing of his Resistance." Supplement
(continued...)

situation to the situations of Amy Close and Whitney Gauley.

According to an affidavit provided by Close, Pierce behaved as if she "hated" Close. Oberthien App'x at 24. Specifically, Pierce obstructed Close's ability to perform her work, yelled at Close, "put her hand right in [Close's] face" and swore at Close. *Id.* Additionally, on one occasion, Pierce attempted to prevent Close from leaving work due to a hand injury that Close sustained outside of work. *Id.* at 24-25. When Close decided to leave work anyway, Pierce yelled at her in front of her colleagues. *Id.* Close ultimately quit working at CRST. *Id.* at 23.

According to an affidavit provided by Gauley, Gauley qualified for eighteen weeks of maternity leave—six weeks of short-term disability and twelve weeks of FMLA leave. Gauley Affidavit (docket no. 18-1) ¶ 7. When Gauley returned to work early—after eight weeks—CRST discontinued her FMLA leave, rather than allowing intermittent use of the remaining leave balance. *Id.* ¶¶ 7-8. When Gauley sought to take periodic time off after her return, Pierce required her to provide documentation, such as a doctor's note, justifying her absences. *Cf. id.* ¶ 11 ("She made it impossible for me to leave. . . . She would tell me that she needs this or that, like a doctor's note, *etc.*"). During a period of six months following Gauley's return from maternity leave, Pierce denied several of Gauley's requests to leave work. *Id.* ¶¶ 8-10. Eventually, Gauley left work without receiving Pierce's permission, and Pierce "appeared to be very angry" when Gauley did not heed Pierce's text-messaged request to return to work. *Id.* ¶ 12. On February 8, 2017, CRST terminated Gauley for "misconduct and violation of the handbook." *Id.* ¶ 5.

Unlike a quintessential pretext showing, wherein an ADA-protected employee puts

---

[5](…continued)
to Resistance at 1. The court finds Oberthien's failure to timely disclose Gauley's evidence to be harmless. As the court describes herein, even considering such evidence, Oberthien fails to establish a genuine dispute of material fact sufficient to defeat summary judgment on his claims. Accordingly, the court shall deny the Motion to Strike.

forth evidence that the employer treated him more harshly than similarly situated non-protected employees, *see, e.g.*, *Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 777 (8th Cir. 2012), Oberthien argues that Pierce treated him just as harshly as she treated Close and Gauley. *Cf.* Resistance at 10-14; Supplement to Resistance ¶ 4. Whatever the merits of this argument, it does not create a genuine dispute regarding pretext. Because there is no showing that Close or Gauley were disabled within the meaning of the ADA at the time Pierce treated them poorly, the examples of their poor treatment have no bearing on the pretext inquiry. Oberthien cannot establish a genuine issue of pretext merely by showing that Pierce was "a very mean person" or a bully, Resistance at 11, but must instead "rais[e] a reasonable inference that the real reason for his discharge" was his ADA-protected status. *Kosmicki v. Burlington N. & Santa Fe Ry. Co.*, 545 F.3d 649, 651 (8th Cir. 2008). From the evidence regarding Close and Gauley, it is apparent that Pierce's treatment of Oberthien was consistent with her treatment of other non-ADA-protected employees. Therefore, it is not probative of pretext. In short, Pierce's treatment of Close and Gauley does not establish a genuine dispute regarding pretext.

Although Oberthien has established a genuine dispute of material fact with respect to an adverse employment action, he has failed to establish a genuine dispute of material fact with respect to pretext. The record, taken as a whole and viewed in the light most favorable to Oberthien, could not lead a reasonable jury to find in Oberthien's favor on his disability discrimination claim. Accordingly, summary judgment is appropriate on this claim.

### B. FMLA Discrimination

FMLA-eligible individuals are "entitled to a total of 12 workweeks of leave during any 12-month period" for use in certain enumerated circumstances. 29 U.S.C.

§ 2612(a)(1). In an FMLA discrimination claim,[6] the employee must show "that the employer discriminated against [him] for exercising [his] FMLA rights." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 899 (8th Cir. 2012) (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011)). Like claims of disability discrimination, FMLA discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework: the employee must make a prima facie showing of discrimination, at which point the burden falls on the employer to provide a legitimate non-discriminatory reason for the adverse employment action, at which point the employee must show that the proffered explanation is mere pretext for discrimination. *Id.* "To establish a prima facie case, [the employee] must show that: 1) []he engaged in protected conduct; 2) []he suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct." *Wierman*, 638 F.3d at 999.

CRST argues that summary judgment is appropriate on this claim because the record does not establish a genuine dispute of material fact with respect to whether Oberthien suffered an adverse employment action or whether any such adverse employment action was causally linked to Oberthien's exercise of FMLA rights. CRST Brief at 8. Consistent with the discussion above, the court finds that Oberthien has established a genuine dispute of material fact regarding an adverse employment action. Therefore, the court shall proceed to determine whether he has established a genuine dispute regarding a causal link between such action and his exercise of FMLA rights.

CRST contends that its termination of Oberthien "had nothing to do with his

---

[6] Although Oberthien fashions his FMLA claim as "retaliation," he specifiaclly alleges that CRST terminated him because he exercised his FMLA rights. *See* Petition ¶¶ 34-41. The Eighth Circuit has advised that such claims are more appropriately considered "FMLA discrimination" claims, as distinct from express "entitlement" and "retaliation" claims enumerated within the FMLA. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005-06 (8th Cir. 2012). Therefore, the court shall treat Oberthien's claim as alleging FMLA discrimination.

exercise of FMLA rights," but instead was the result of Oberthien's failure to properly notify Pierce of when he would be tardy or absent. *See id.* CRST points to the fact that it affirmatively extended Oberthien's FMLA period by eighty hours as evidence that its termination of Oberthien was not causally linked to his exercise of FMLA leave. *Id.* Oberthien argues that Pierce's "aggression toward him was based on his usage of employer-approved FMLA time," such that his termination was causally linked to his exercise of FMLA leave. Resistance at 14. Pierce's "aggression" includes her comments about Oberthien's failure to meet productivity goals because he was incapable of being at work "all day every day." *Id.* However, to establish a genuine dispute of causation, Oberthien must do more than connect his exercise of FMLA leave to Pierce's "aggression"—he must connect it to CRST's decision to terminate him. The evidence in the record supports no such connection.

First, Oberthien qualified for and exercised his FMLA rights for approximately one year prior to his termination. The significant length of Oberthien's unimpeded exercise of rights prior to his ultimate termination "dilute[s] any inference of causation." *See Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013) (quoting *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1003 (8th Cir. 2005)). Second, even when Oberthien exceeded his 480-hour FMLA allotment in October of 2014—four months before his FMLA eligibility reset—CRST opted not to terminate him. Instead, it provided him eighty additional hours of leave time to which Oberthien was not otherwise entitled under the FMLA. *See* CRST App'x at 69. Such evidence indicates that CRST had no discriminatory animus with respect to Oberthien's FMLA usage and, indeed, supported him in his usage of leave time. Third, the record establishes that CRST took no formal action against Oberthien regarding his usage of leave time—or any productivity issues relating to his usage of leave time—until he consistently failed to provide notice of his tardiness and absences. And, even then, Oberthien received no discipline until he had

compiled thirteen incidences of tardiness without the requisite notification.  *Compare* CRST App'x at 85 (email sent December 18, 2015 describing thirteen instances where Oberthien was tardy without notifying Pierce), *with* CRST App'x at 58 (Oberthien's first written disciplinary action for being tardy without providing notice, issued on January 2, 2015).  Fourth, Oberthien's termination occurred mere days after two undisputed instances of misconduct, wherein he again failed to notify Pierce of his tardiness and proceeded to disparage her to another CRST employee.  The relative promptness of CRST's decision to terminate Oberthien after his misconduct is consistent with a conclusion that such misconduct was the sole motivation for his termination.

Whatever Oberthien's perception of Pierce's "aggression," the evidence in the record is insufficient for a reasonable jury to find that Oberthien's termination—the actual adverse employment action of which he complains—was causally linked to his exercise of FMLA rights.  As such, Oberthien has failed to establish a genuine dispute regarding the causation prong of his prima facie case of FMLA discrimination.[7]  The record, taken as a whole and viewed in the light most favorable to Oberthien, could not lead a reasonable jury to find in Oberthien's favor on his FMLA discrimination claim.  Accordingly, summary judgment is appropriate on this claim.

### C.  Hostile Work Environment

"In order to establish a claim of harassment or hostile work environment, a plaintiff must show: '(1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's

---

[7] Although CRST premises its FMLA discrimination argument on the causation prong, CRST Brief at 8, the court additionally finds that Oberthien fails to establish a genuine issue with respect to pretext.  *See Chappell v. Bilco Co.*, 675 F.3d 1110, 1117-18 (8th Cir. 2012) (observing that an FMLA-eligible employee creates no genuine issue with respect to pretext where an employer terminated the employee for "violat[ing] the attendance policy" and where the employee counters the employer's proffered reason with weak evidence supporting prima facie case).

protected group status; and (4) the harassment affected a term, condition, or privilege of employment.'" *Kelleher*, 817 F.3d at 634 (quoting *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006)). To determine whether harassment affects "a term, condition, or privilege of employment" under the fourth element, the court "consider[s] the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with [the employee's] job performance." *Sellers*, 791 F.3d at 945 (quoting *Ryan*, 679 F.3d at 778-79).

CRST argues that a reasonable jury could not find that any harassment experienced by Oberthien rose to a level affecting a term, condition or privilege of his employment. CRST Brief at 9. Oberthien contends that evidence of Pierce's "daily intimidation, ridicule and insult" is sufficient to raise a genuine dispute of material fact regarding his claim of hostile work environment. Resistance at 16.

Oberthien points to evidence of four particular instances of harassment that he claims are representative of the harassment he endured while employed by CRST: (1) Pierce confronted Oberthien when he left work early and reminded him that there were "loads still on the board"; (2) when Oberthien failed to promptly answer a ringing telephone, Pierce commented, "Do you not know how to answer a phone? Then you probably shouldn't be working here."; (3) during a team meeting with other co-workers, Pierce addressed Oberthien's failure to meet productivity goals by stating, "if you were here all day every day you would have hit your goals"; and (4) Pierce reassigned one of Oberthien's carrier loads to another employee because she disliked the terms that Oberthien had negotiated. CRST Facts ¶ 14; CRST App'x at 10-11. Even assuming that there are additional instances of this kind of treatment, as Oberthien claims, such treatment does not establish a genuine dispute of material fact regarding his claim of a hostile work environment.

First, a reasonable jury could not find Pierce's comment about the telephone and her reassignment of Oberthien's carrier load to be causally connected to Oberthien's ADA-protected status. Oberthien himself recognizes that Pierce made the telephone comment because he failed to answer a ringing telephone while he was present at work and that she reassigned his carrier load because she did not like the rate that Oberthien negotiated. *See* CRST App'x at 10-11. Whether Pierce's actions were rude, insulting or unreasonable is irrelevant if they are unconnected to Oberthien's ADA-protected status because the "anti-discrimination laws do not create a general civility code." *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003). As such, even if this conduct is representative of additional conduct not specifically identified, and even if it affected a term, condition or privilege of Oberthien's employment, evidence of such conduct does not establish a genuine dispute regarding the causation prong of a hostile work environment claim.

Second, a reasonable jury could not find Pierce's other conduct to be sufficiently severe to affect a term, condition or privilege of Oberthien's employment. Pierce's comments about Oberthien leaving early and his failure to meet production goals, even if rude or insensitive, are neither physically threatening nor humiliating, and there is no evidence that the comments interfered with Oberthien's ability to do his job. *See Sellers*, 791 F.3d at 945. While Oberthien might have subjectively found Pierce's comments hurtful or embarrassing, *see* Oberthien App'x at 6, "[a] hostile work environment must be both subjectively and objectively offensive, as well as 'extreme in nature and not merely rude or unpleasant.'" *Ryan*, 679 F.3d at 779 (quoting *Sutherland v. Mo. Dep't of Corr.*, 580 F.3d 748, 751 (8th Cir. 2009)). A reasonable jury could not find that Pierce's comments were objectively offensive or extreme in nature. As such, even if Pierce's comments are representative of additional conduct not specifically identified, evidence of such comments does not establish a genuine dispute regarding the "term, condition, or privilege" prong of a hostile work environment claim.

Oberthien has failed to establish a genuine dispute regarding the causation prong and the "term, condition, or privilege" prong of his hostile work environment claim. The record, taken as a whole and viewed in the light most favorable to Oberthien, could not lead a reasonable jury to find in Oberthien's favor on his hostile work environment claim. Accordingly, summary judgment is appropriate on this claim.

## VIII. CONCLUSION

In light of the foregoing, CRST's Motion to Strike (docket no. 19) is **DENIED** and CRST's Motion for Summary Judgment (docket no. 13) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant. The trial date is **VACATED**.

**IT IS SO ORDERED.**

**DATED** this 24th day of March, 2017.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA